Please all rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd Judicial District is now open for suit and adjournment. In honor of Susan F. Hutchinson. Please be seated. Your Honor, this case is about 2-15-0842. F. Fiala, plaintiff's appellate, a Hudson Harrison, and numerous intervenors, defendants' appellees. Arguing on behalf of the plaintiff's appellate, Attorney Mr. James P. Newman. Arguing on behalf of the appellate, Hudson Harrison, Mr. Dirk J. Price. Arguing on behalf of the numerous intervenors, Mr. Joel E. Marksman. Mr. Newman, whenever you are prepared. May it please the court. My name is Jim Newman. I represent F. Fiala in this matter. This is the second time that this case has been before this court. Third time it's been up in front of the appellate court. It went up to the 7th Circuit years ago. This case was filed about 7 years ago. It's a 7-year-old case. It's gone through different court systems. But to date, after 7 years, not a single defendant has answered the complaint. Nor have they answered discovery. Because the courts have decided to stay discovery while we are working through these pleading requirements. But in any event, this is the second time it's been before this court. The last time it was in front of this court, Your Honor wrote the opinion reversing the dismissal in the lower court. There are two issues that I've raised in my brief. One is a procedural issue which has to do with the prior appeal. And the other is basically a factual issue on whether the complaint states a cause of action under 2615 or 2619. I'm going to deal with the second issue first because it's outcome determinative to some degree. Because if this court determines that they're going to follow the midway decision that I cite, then this case should be reversed and we don't have to look at anything else. Because you've already ruled on the issue. Which issue have we already ruled on? I want to be crystal clear on what you think that is. That the complaint states a viable cause of action. In other words, you've ruled on the 2615 motion. And let me explain why. And we'll call that the first appeal and we'll call this the second appeal. Prior to the first appeal, each of the defendants filed either 2615 or 2619, in some cases combined motions. They all filed the same motion moving to attack the sufficiency of the complaint. The circuit court in that matter ruled on one of the issues that the Wasco Sanitary District had raised and dismissed the complaint in its entirety against all of the defendants. Because? That was on a standing issue. Correct. On a standing issue. Which would have been dispositive of the whole issue or of the case if, in fact, that ruling was correct. That would be correct, yes. That case came up. Fiala filed an appeal. That case came up to the appellate court. This court heard the argument of all the parties and reversed. And reversed it and we argued it Monday and we got an opinion on Friday. It was a very quick case. It went back down to the court. Wasco Sanitary District didn't answer the complaint despite the mandate of this court. And then all of the other defendants filed, and in this case we'll talk about Harrison particularly, filed the exact same brief, almost verbatim, it's in the record, before the court. Our position is that you're not permitted to do that because to do so would allow piecemeal litigation, which is exactly what's happening now. But aren't the issues in 619 and 615 significantly different so that they are designed, one, to attack possible affirmative defenses or legal issues, and the other to attack pleading issues? They address different things. Well, they do. There's a different standard. But at the end of the day, what are they attacking? And what is the Supreme Court and this court has said in the past is in both instances they're attacking the complaint. And as this court is well aware and as every defendant cited in their brief, that this court can affirm a dismissal on any grounds contained in the record. The Illinois Supreme Court has said with respect to a 2615 or 2619 motion, the only thing that this court needs to affirm a dismissal is the complaint itself because it's the only thing that's at issue. But the trial court is supposed to have an opportunity to correct a mistake if, in fact, they've made one. And in this case in Fiala 1, the trial court never even addressed the 615 issues. It only addressed the 619 issue. And that's where, for example, the Midway decision that I cite is directly on point. Well, except in Midway there was a litigation before the administrative agency as well as the director. Both of those issues had been resolved by a hearing of some nature. The trial court was we don't review a trial court decision in an administrative matter. We review the administrative matter. And both of those issues on that tax, rolling tax matter had been decided by the director. But that's, I think, partially true. But I think the role of the appellate court in Midway is the same exact role that this appellate court here has, and that's reviewing what the circuit court did. In an administrative review decision, you basically have two separate appellate processes. Your first appellate process is actually the circuit court, which is what happened there. So you have an administrative body make a decision. It goes to the circuit court. They make a decision. And then this court doesn't review what the administrative court does. It reviews what the circuit court did. And there are steps here. In Midway, what happened in that case was that in the circuit court, the Midway made two arguments, and the circuit court ruled on one as being dispositive and never got to the second argument. The same exact thing happened here. But the administrative agency had done both, had ruled on both the towels and whatever the other issue is. I can't remember now. Both of those have been briefed. Both of those have been decided. And we do review the decision of the administrative agency, not the decision of the circuit court. Well, from an appellate standpoint, the issues, if you look at what the Midway, in the quote in Midway, what Midway says, the court says, and that, I believe, is a second district case. There's another one that's a first, excuse me, Midway's first district. Yes. The other case I decided was a second district case. But in Midway, what the final decision came down to, and it's not dicta because it was actually the holding in the case. The plaintiff in Midway, just as the defendants here, said in the event that you reverse, the circuit court has got to be remanded so the circuit court can decide the second issue. And the Midway court said, no, you don't get a chance to do that because you've waived it because you didn't raise it. And there's, as I cited, I think 15 cases that stand for that proposition, that if you don't raise it in the appellate court, you waive it. And it's the whole purpose of that. You didn't ask the trial court here to rule on the 2615 motion. Is that correct? The trial court never ruled on the 2615 motion. Is that correct? Mr. Harrison's motion? Yes. They did not. Well, it ruled on it in the sense that the ruling was that because of the dismissal, they didn't have to get to it. So they didn't rule on the merits. So they didn't rule on the merits. Yes. Okay. But, again, on the motion to dismiss. And let's talk about that for a moment, because what the appellate court did in the first appeal, which I bring out. All of the defendants cite the rule that the court can affirm on any grounds contained in the record. One defendant, which was the Beanby defendant, raised an issue in the appellate court which was not raised or not ruled upon. It was raised but not ruled upon in the lower court, and that was the res judicata issue. They did it correctly. They said, by the way, Justices, in the event that you don't decide this issue, we still have res judicata. This court properly ruled that res judicata doesn't apply. Yet the first judge, Judge Brown, when he ruled to dismiss it, didn't make any ruling as it relates to res judicata. Why is that? Because this court can affirm on any grounds in the record, and it's appropriate for the defendant here to have done that. But they didn't do it with all their arguments, and that's the whole reason why it's piecemeal litigation. You can't pick and choose. But once again, res judicata would be a 619 issue because it would be substantive and it would resolve the issue, dismiss, no further discussion. The 619 issues were discussed. There's nothing in that first record, and I have some familiarity with it, as you indicated, that talks about 615. Judge, once a 615 motion is granted, it's substantive in nature. But it wasn't even discussed. 615 wasn't even discussed. Maybe an easier way to state this argument is simply this. Had the defendants in the first appeal come before you and raised the issue, Judge, Justices, we have these other four issues that we can raise that should affirm the dismissal. This court had jurisdiction and properly would have ruled on those issues. They would have because they have jurisdiction. This court has said it. The Supreme Court has said it. And I think what the case law says is if you can bring it, you must bring it. That's the whole doctrine of waiver, and I've cited many cases that say that. But I think the Midway case is about as close as possible on it. I realize there's a distinction between a 615 and a 619 motion, but that's not really what the court should focus on. What the court should focus on is there something in the record which allows the court, this court, to rule on something that happened below. And on a 615 and a 619 motion, there's only one thing in the record that matters, and the Supreme Court has said it. It's the pleading, the complaint itself. And if you have the complaint before you in the first appeal, you can have affirmed the dismissal on any grounds. And I've cited numerous cases. There's not a single case I found in Illinois that has ruled otherwise. So you wanted us to affirm the dismissal? Did I want you to affirm the dismissal? So you wanted us to affirm the trial court's dismissal. No, I wanted them to. That's what you're talking about. No, what should have happened is that if the defendants wanted to raise their issues that they raised initially, they were required to raise it in the appellate court the first time so that I could address it, and we don't come back here again two years later because— Well, you should address it. You both should address it before the trial court because we're correcting their mistakes or affirming their correct rulings if they so rule. We don't do—we're a court of limited jurisdiction. Why would we do that if it had not been discussed and the trial court did not have an opportunity to correct the issue himself or herself? Why would we do that? That's not—I did not file a 2615 or 2619 motion, and if it was me as a defendant that had filed such a motion, I would have asked for the court to rule on them because it's been fully briefed, and I'm talking about in the first appeal. That would be my procedure, which I do as a matter of course anyway for this exact reason because I know having been in front of the appellate court and am familiar with the law on waiver that I've got to have somebody rule on something in order to get it in front of the court, and if I was on their position from a defense standpoint trying to preserve that judgment, I would have done exactly what defendant B&B did on the one issue that they wanted to raise. I would have said, hey, what about this? And by the way, the motions that have been filed in court below were both a 2615 and a 2619. Harrison's motion, as an example, as I point out in my brief, in both instances fails to cite any rule. He didn't cite the 2615 or 2619. He filed the identical brief. So, but I'm going to move— Let's talk about this at some time. The other issue here is does the complaint state a cause of action? Against Harrison. And I've cited some case law again that I think is directly on point there. The facts of this case are not complicated. Harrison, as the complaint alleges, and as Your Honor's opinion, every opinion points out, was involved in a scheme to defraud the sanitary district of millions of dollars. This is a public trust case, and he paid the money knowingly to a third party that should have gone to the district. But was he pursuant to an ordinance? I mean, wasn't he obligated to do that? There is no ordinance that requires that. It's not in the record. It doesn't exist. That is a falsity by Mr. Harrison in Mr. Harrison's brief. He doesn't cite to any part of the record. There is no ordinance that requires that. It's not part of the record. Is there any agreement? Is there any public agreement that requires that between the parties? No. Nothing in the record. If they want to create a record and go down that route, that would be a motion for summary judgment. I do not allege it in my complaint. Everybody here knows what the standard is on the motion to dismiss. The allegations in the complaint are deemed admitted or true for purposes of discussing whether it states a cause of action. And one of the things that you cannot do in a motion to dismiss, whether it's a 2615 or a 2619, is refute the allegations in the complaint. And a 2619, you can say there's another fact over here that even if this is true, there's another fact over here which would defeat the claim. That's what a 2619 is. But in both instances, the standard is the same. If I say Harrison paid $100, he can't come in on a motion to dismiss and say, no, I paid $0 or $200. For purposes of stating a cause of action, he paid $100. Now, he can come in on a motion for summary judgment and attach an affidavit and a photograph and a check, whatever, but that's a motion for summary judgment. That's not what's going on here. What we're here for is does this complaint that's before you state a cause of action? It alleges that Harrison knew that he could not get into the district. He was denied the right to get into the district unless he paid a lot of money for infrastructure for the district. That's part of the record. There's documents attached to support that allegation. He then hired B&B's vice president. Of all the 4,000 attorneys in the state of Illinois, he hired the one attorney who happens to be brother-in-law and employee of two of the three trustees, and suddenly he's a part of the Roscoe Sanitary District. But the money that was supposed to be paid for that infrastructure, which, again, the record shows is there, doesn't get paid to the Sanitary District. It gets paid to B&B. Well, why did it get paid to B&B if it was for infrastructure? Because the Sanitary District was controlled by an employee of B&B and a brother-in-law of B&B, and it was corrupt. Simple as that. Corruption. It happens that the state of Illinois, unfortunately, has, I think, the 48th state as far as corruption. There are only two other states more corrupt than the state of Illinois. Well, we can't litigate that here today. Well, I understand that, but unfortunately that is what the complaint alleges. And the issue is, do I get it? Does Fiala get his day in court to prove those allegations? The why question that you're asking is not a question that should be decided in a motion to dismiss. It gets decided in a motion for summary judgment. Is it the issue, are you raising the fact that it's the amount of money, or it's any amount of money? It's any money. No money should have been paid by Harrison to anyone other than the Sanitary District. Well, he did have to pay, I assume, an attorney fee. I'm sure Mr. Griffin isn't working for the good of the foundation. I'm talking about what I'll call the connection permit fees. Wasn't that pursuant to the annexation agreement that those fees were paid, the 1994 annexation agreement? The 1994 annexation agreement has a provision in it that allows what I'll call for reimbursement, which is Exhibit N and Exhibit O. Exhibit N and Exhibit O were never executed, never voted upon by the Sanitary District. And, in fact, as you'll have an opportunity to ask every defendant here, they are not contending that there is any right to reimbursement in that agreement. That's what their original contention was, but the 1994 annexation agreement does not provide, to answer unequivocally, and it's alleged in the complaint as such as well, does not provide for reimbursement. It was never executed, and the parties, everybody agrees it was never executed. It was never voted upon by the district. It is just a proposal that is there. They are relying upon something else, and I'll deal with that because I'm out of time, but they were relying upon 70 ILCS 2805-8, which has absolutely no application to this case at all, and I'll deal with that when I have time in my rebuttal. All right. Thank you. You have an opportunity to reply. Thank you. Mr. Price? Good morning, judges. May it please the Court? Good morning. Mr. Harrison just wanted to develop his property, and so he did what the district directed him to do. It starts with the 1994 annexation agreement. It's paragraph 15 of that agreement, and it does refer to exhibits O and Q for not N. O and Q are the examples of what the agreements are supposed to be, that you have to buy your capacity from B&B. And was the agreement signed? The annexation agreement is signed. The exemplar exhibits O and Q have to finally be negotiated and then signed, and they were. If you go to Exhibit C to his complaint, and he has to live with the exhibits. If an exhibit contradicts a pleading, an allegation, that's not well pledged. In Exhibit C to the complaint, that is Harrison's annexation agreement with Wasco Sanitary District. And Exhibit C to Exhibit C is, in fact, the repayment and reimbursement agreement that Harrison has with B&B. If you read the annexation agreement, Wasco Sanitary District directs Harrison in Exhibit C, the first exhibit, that he must go get a repayment agreement from B&B as a condition of annexing. And that agreement with B&B, according to the annexation agreement with Wasco Sanitary District, has to be in a form and terms that are acceptable to the district. I'll read from that, it's in the record, if you want to find it, it's at page 349 of the record. It says, the owner shall provide the district an executed copy of an agreement between owner and Fox Mill, which shall provide for the assignment of Fox Mill's wastewater and water capacity to the owner in the form of Exhibit C. That's later on in this agreement. Northern Lakes Capacity Agreement shall include the terms specified within the annexation agreement with the district and other terms the district may reasonably require of Harrison. The Northern Lakes Capacity Agreement shall also be in a form acceptable to the district. So the district is telling him everything he has to do. Who he has to pay, what form the agreement to pay and buy it has to be in, and that's what he did. He went off and did it. And every other person that ever paid B&B for capacity, regardless of the amount, and I love that question, Justice Hutchinson, about the amount, is alleged to be a victim. Including former, would-be and inadvertent, apparently, plaintiff, Kobler Holmes. Exhibit P to the complaint is a $2,400 check from Kobler Holmes to B&B. They were a plaintiff. But when Harrison does it, because it's 106 lots in the new Campton Hills, and we don't want any development, that's in paragraph 78 of their complaint. I'm not making that up out of the record. Well, then it's a problem, because it's 106 homes instead of Mr. Kobler, the former plaintiff's four homes or five homes. He did what everybody else has done, and in paragraphs 41, 42, 43, 50, 51, and 75, everybody else who paid is a victim. But he's supposed to be now a co-conspirator and a defrauder. How, in obeying the Wasco Sanitary District, did he make a misrepresentation for that? And one of these documents, and actually we should have had a whiteboard here, and I think for purposes of public records, I don't think you should have to go through this, because it is confusing and possibly deceptive, but let's move on from that. One of these documents that you've talked about have actually been signed and have been accepted and have been put of record as the actual agreements between parties. Exhibit A to the complaint, the 1994 annexation agreement. That's been signed by the Wasco Sanitary District and B&B. And they passed that. They did. And if I can quote from Mr. Newman, this is what he said to Judge Mueller. This is found at page 33 of the transcript of the proceedings in front of Judge Mueller. I have the Wasco Sanitary District ordinance here, which sets the fee in this case for the connection permit, and I'll give it to you. It sets it at $6,000. This was put in place after the 1994 annexation agreement. Then it was amended in 2000 and reaffirmed the $6,000 fee. So the Sanitary District has an ordinance. Again, I'm just reading what Mr. Newman said. That says, we are going to have, we have a fee in order for you to connect, but meanwhile, I also have another document from the Sanitary District, which is part of the record, in which it says, applicant pays water and sewer connection fee to B&B and Fox Mill Limited Partnership. That's on every single connection permit that I have attached to my complaint. So that's all agreed and signed. There's the ordinance that we were referring to, the one he gave to Judge Mueller and asked him to take judicial notice of. That's from Mr. Newman. And then also signed, Judge, to your question, is Exhibit C to the complaint. That is the fully executed annexation agreement between Harrison and Wasco. And Exhibit C to Exhibit C is the fully executed capacity purchase agreement between Harrison and Fox Mill that the district required of Harrison. And that's signed also?  So are B&B operating as some sort of trustee for Wasco? Why isn't Wasco doing its own collections and their own administration of this plan? If we look at the 94 agreement, what it sets up is the following. This is a huge capital expenditure outlay. And the Wasco Sanitary District could have floated bonds and built it itself. But instead, as happened frequently in Kane County out here, we asked the developers to bear the freight of the infrastructure and to build it bigger than what they precisely need themselves. And then they can recapture monies back from other people who will hook up to these things. That was the original deal. From the get-go, in 94, they anticipated that they would be recalculating the amount of capacity that they had. They even anticipated that maybe what they assumed wasn't enough capacity for the original development. That's all in the 94 agreement. And so to your point, Justice, the issue was we'll get them to build it, and then they're taking the risk. If there are others who want to hook up to a bigger-than-needed plant, well, then they can recapture that from them, and we'll give them an interest tick to encourage them to do this deal with us. So the district, without laying out taxpayer money or incurring debt, gets all the infrastructure it needs. And the developer gets some reward for its risk because in the future, if others come in to use it, they get paid back with interest for having borne the freight of building this capital that benefits the general community in the first place. All right. Now, this structure, this isn't the first time something like this has been done. Recapture agreements are common, are they not? That's right. And part of the discussion is that in the municipal code, that's where you find the authority to enter into a recapture agreement. We say that the Sanitary District Act gives them the ability to do this, the very broad grant in doing it. Enough so that when Harrison comes in, one of their arguments now is that Harrison should have had some sort of Uber lawyer or the Archangel Gabriel who looked at all of this and said, oh, even though you weren't around in 94 and even though this is what the district has told you by law you must do, you should have known better. How is Harrison supposed to know better? Well, I mean, I assume Mr. Harrison is a businessman. Yes. He would not have engaged in this type of development if he wasn't, even if he's the front man for a group of people who are behind him with this property. He is instructed by some document to give money to B&B. Yes. And he hires B&B's vice president as his lawyer. There are no other lawyers around that he can hire where there wouldn't be a conflict or a possible conflict? Well, let's talk about that. One, the documents actually, it does say in the allegation that he has to do it, but in Exhibit C, to Exhibit C, in the capacity agreement, remember, that the district made Harrison have, it says, and the record citation is page 380, it says that B&B will be the sole representative of Harrison before the Wasco Sanitary District. So, it says, notwithstanding, B&B agrees at its sole cost and expense to prepare and negotiate the annexation agreement on purchaser's behalf. What the district required Harrison to do was to hire B&B to represent him before the Wasco Sanitary District. That was a requirement of the agreement. So, yes, according to the allegations, Harrison hires Griffin in June. But according to the allegations, the conflict we're talking about, the potential bribery, the bribes were solicited under the allegations by Venezuela in April of 2008. And all, the only scienter of Harrison, the only knowing part of Harrison is that he knowingly allowed Griffin to bribe Venezuela. Well, if he didn't hire Griffin until June, how did he knowingly allow Griffin to bribe him back in April? Is there a time machine? It's not alleged. It makes no sense. It's just a throwing. In fact, he says the allegations are in paragraphs 40, 41, 42, B&B and FMLP paid the bribes to Venezuela. And that's ignoring paragraph 18, which says Venezuela was always under family control anyway. So, why B&B is bribing somebody who already they control, according to the allegations? That's a contradiction. The timing is a contradiction in the logical. These are not well-plaid facts that are worthy of being sustained or that state a claim for which relief can be granted. Well, then why should they, if they're not well-plaid and no discovery has yet happened formally, why should the dismissal have been with prejudice when other issues could come up? And, in fact, Judge Mueller actually says, it's an interesting turn of phrase, there is some odor to this. But not for Harrison. Well, but Harrison wasn't there in 94, but he's now here in 208 and forward. And he's still part of this big kind of circle that keeps going around and around and around and always ending up at B&B. Then everybody would be, Judge. Everybody who paid any fee to B&B should be here. Well, that's a possibility, but we're not talking about them today. No, but that is exactly the policy argument you'd be opening up, is that no developer can rely on duly passed ordinance of any unit of local government because regardless of how long in the future, 14 years later, somebody could challenge that ordinance as being invalid, and then the whole apple cart is upset. We have principles in the law that allow us to move on, statutes of limitation and repose, so that we move on. Things have to be certain at some point. This is asking to upset an apple cart that's 14 years old on questions that Harrison, if he looked at it, would have said in due diligence. They have the authority to pass such an ordinance. They did pass such an ordinance. I'm complying with the law. You're saying, essentially, Justice, that if Harrison obeys the law, he can still be a conspirator for obeying the law. That can't be the ruling. It's possible, and this is why with prejudice is often a problem in these 615 cases. It's possible that with discovery and with other investigation, he may have actually been around in 1994, and this was a long-term plan. But they've never even alleged that. They haven't even alleged that he was around in 1994. They begin with the exhibit, exhibit D, which says the first time Harrison inquired about the passing was in 2005, and there is no allegation that he was around in 1994. He didn't say so to Judge Mueller. That's not in the record, Justice. Well, did he testify before Judge Mueller? Oh, you mean Mr. Newman didn't say so. There's no hint of that at all. And frankly, if somebody alleged that, that would be sexual. You have to have a reasonable basis to say he was around in 1994. Isn't that why there should be discovery? Not on this kind of claim where he's had four shots at the thing. He's only had three, and this is the third immediate complaint. You're forgetting the one that started out in federal court was dismissed and restarted. But that, again, on some different issues. But, all right. Justice Jones, I'm done. Okay.  Thank you. Mr. Bertocchi? Good morning, Your Honors. My name is Joel Bertocchi, and I represent the three trustee defendants, and I'm appearing today on behalf of all the intervener athletes. Let me ask one question. Sure. Were you involved, and I apologize for not remembering, were you involved in Fiala 1? I was in the courtroom. I did not argue. I represented parties whose motions were never ruled on by Judge Brown. All right. And who filed briefs in 1, if you recall? My recollection is that the district did and that Mr. Griffin did, because Mr. Griffin was raising an issue, the res judicata issue, that was about the effect of the ruling Judge Brown made. All right. Mr. Griffin is B&B, or Mr. Griffin is? B&B. Well, he's a defendant also. Right. I know he is. But because I'm trying to figure out who's on first here. I don't blame you, Your Honor. It's been a long time. That's why I was concerned. All right. That actually goes to one of the points I was going to make. Okay. And I'll let you go there now. Thank you. The B&B issue, the issue that B&B raised, where Mr. Newman says everybody should have done it, Mr. Griffin was raising an issue, B&B was raising an issue that mattered to the ruling that was on appeal, which was the standing ruling. And let me paint a picture for you of what this appeal would have looked like. Because I think we've cited all the cases. We've distinguished Midway Airlines. I think the court got to some of that in its questions. But let me paint a picture for you of what Fiala 1 would have looked like if Mr. Newman was right about the rule. What you had in Fiala 1 was a six- or seven-page standing ruling, briefs that were about this big. The complaint that Mr. Newman said we should have attacked and asked you to consider for the first time in Fiala 1 was 108 paragraphs and hundreds of pages of exhibits, which we would have had to brief. The briefs would have been this big. And you would have been asked to wade through it without the benefit of a circuit court opinion, whereas you said the judge would have taken the first crack. I've been doing appeals for a long time in front of state and federal courts. There's no way you would have done that. You would have said we're sending this case back to the circuit court to consider those motions. As the court pointed out, they're different kinds of motions. They were never ruled on. They were pending then, and they're pending now. Mr. Newman says he cited a bunch of cases that stand for this proposition. There is no case that stands for the proposition that different parties filing different kinds of motions that are never ruled on have to bring up those issues in an appeal made by a party whose motion is ruled on. There is no case like that. There are lots of cases that say you can affirm on any grounds that are available. That's a very fine general proposition that nobody disagrees with. But the issues were not before you. And speaking of issues that are not before you, I will conclude, I wasn't going to, by talking a little bit about the ordinance issue that you spent some time on, Mr. Price, and Mr. Newman spent some time on. First thing I want to tell you is that that issue, the issue of whether the money was properly paid to B&B instead of to the district, is currently before Judge Phoenix in this case with respect to the remaining defendants. He's ruled in part. He has other motions pending. He's going to deal with that. And, again, you will get a fully briefed and fully decided ruling, because we'll be back. I'm sure we will, one way or the other. It is worth mentioning, though, that the two sections of the Sanitary District Act are both good law, and as Mr. Price indicated, the money was paid to B&B instead of the district because B&B paid for the infrastructure. Section 8 of the Sanitary District says you may finance your district by any means. The district didn't have the money. The developers had the money. And all of this, again, I don't want to spend too much time on it because it will get here, and it will get here the right way. Section 8.1 is what Mr. Harrison was proceeding under because he wasn't one of the guys who built the infrastructure. It's all there. Both those sections are good law, and someday I will probably appear before you again to talk about that. Thank you, Your Honors, and thank you for allowing us to intervene. We appreciate it. Mr. Newman. Let me address several of the key points here. If you look at Exhibit II of the complaint, one of the questions that was asked by the bench was, is there a right to reimbursement in the original agreement? Exhibit II, which is the 2004 construction and reimbursement agreement for more work being done, specifically says that there was no right to reimbursement, whereas there was no right to reimbursement in the 1994 agreement. They're doing it now. And who signed that agreement? The Sanitary District and the defendants. They've already agreed. Mr. Harrison, too, or no? No, Mr. Harrison was not part of that agreement. That's actually part of the public record. But all of the other defendants were part of that. So there is no agreement. And let me also explain. How is Mr. Harrison paying – how is – why is he still – why should he still be involved, I guess, is the question. So in order to answer that question, I have to give you a 30-second breakdown to correct the numerous things that were made in error here. So the 1994 agreement, as everyone has admitted in the pleadings, does not contain a right to reimbursement, and nor could it because it would violate the law because in 1994 the Sanitary District Act didn't permit it. So that's – so there's no agreement in place. What B&B paid for, when they said B&B – so what is this issue about? You just heard the attorneys come up here and say, well, B&B paid for all this. They get the right – you know, they get their money back. No, they don't, because the only way they could do that is if they do it legally, and the law in 1994 didn't allow them to get their money back. What the agreement says, which is Exhibit A, the original 1994 annexation agreement says, you pay for this infrastructure, which according to the records attached to the complaint and that I've been able to receive through FOIA, was $1.6 million. They paid $1.6 million for the property and building and infrastructure to expand the Sanitary District. What did they get for that? As I set forth in my brief, very specifically, it's unequivocal. They get to connect Fox Mill, which is a development, that subject property. They get a finite maximum amount of PEs, which I think was 7 – or homes, which I think was 714, whatever the number is. Is there an agreement? That's all they got. They've built that. What they've done is we paid the $1.6 million. We get to sell all the remaining capacity and make over $10 million. There is no agreement in place anywhere that allows them to do that. When they cite the Sanitary District and they say, oh, the Sanitary District says that the Sanitary District can do whatever it takes to finance. Okay, it does say that. Where's the agreement? There isn't one. There's no agreement between B&B and the Sanitary District to get that money back. That's the theft that's going on here. They can talk all they want about agreements, but they don't exist. They're not part of the record. And again, on a motion to dismiss, this case should never have been dismissed based upon arguments that aren't supported by the record. But even if they were supported by the record, it's a summary judgment motion, not a motion to dismiss. There's no agreement for financing. And one other thing to answer Justice Inhofe's question about an ordinance. There is, in fact, an ordinance. I misspoke because I kind of misunderstood your question. There is an ordinance in place by the Sanitary District, which was part of the record, that requires the applicants, such as Harrison, to pay the Sanitary District a connection fee. That's part of the record. There is an actual ordinance that says that. So if that's the ordinance you're talking about, yes. But there is an ordinance in place, which is the question I thought you asked, that says somebody needs to pay B&B. There is no such ordinance. So when he says there's an ordinance in place and he's hiding it from the record, he's actually supporting my position. Because there's nothing in place that says that you can divert these funds away. That's the whole purpose behind the public trust doctrine. That is the issue. And the last thing I want to talk about, well, there's two things. This is why Judge Mueller dismissed Harrison with prejudice from this case. And it's found on page 51 of the report of proceedings, which I think is 51 of the report of proceedings. I want to just read you a quote, which could not be more erroneous on what the law in Illinois is. And he's talking about Harrison. He says he was going to pay it to Roscoe. He was going to pay it to B&B. It doesn't matter who he paid it to. He paid it and he didn't do anything wrong. There couldn't be a more wrong statement of the law in Illinois than that conclusion. Because bribery, which is what we're talking about here, is a two-party offense. The person who pays it and the person who gets it, both civilly and criminally. That would be a chimp. What he's suggesting here, and I use the example of a ticket, but that would be as egregious as me coming to this panel and saying, I would like to write you guys collectively a check for $2.6 million to rule in my client's favor. I'm going to pay it anyway. That's the same thing. That's not what the standard is. And if I may just make one more point on something, Judge. The statute in question here that they're relying upon, the section of the act, it does not apply to this case. Because what they're suggesting and what the judge ruled down below was the idea that the district has to do whatever expedient and quickly in order to get the district up and running. It has an enforcement mechanism through the Secretary of State and the State Attorney's Office. It's a penalty in the event that they delay doing things. It is not a blank check to break the law. And as I point out in my brief, and I think it was the attorney for Harrison, he actually had the audacity to say in front of Judge Mueller, if they wanted to, they could have robbed by they, meaning the district. They could have held up a liquor store and paid for the sanitary district improvements because that's how broad the act is. He actually said that in record. That is not the law in Illinois. You cannot do that. So that's the reason why I'm asking this court to reverse this issue and with specific instructions that answer the complaint and to allow discovery. So we can move this case along. We're almost eight years into this case, and we don't have an answer to the complaint. Wait a minute. You're asking us to reverse the dismissal on a 2615. That's your remedy. Whatever the trial court does beyond that. I understand that, Judge. You're right. All the parties are here. I am asking the court to reverse it on the 2615 and make findings here. Because as counsel points out, if we don't stop this, we're going to be back here again and again and again, which goes to my first argument that I made. How many times do you get to file a 2615 motion and come up to the appellate court? And my response to that, or 2619, is you get to do it once. And that's, I think, what the law says. But if we don't stop it. Counsel, the remedy you've asked for is for us to reverse this ruling. Yes. That means you go back and get a chance to file yet another complaint. That does not preclude counsel or the defendants from filing yet another motion to attack a new complaint. I'm asking, my prayer for relief is to reinstate the third amendment. It's kind of two parts, maybe, in the alternative. The first prayer is to reinstate the third amendment complaint. That's the first argument I made. That's the complaint that came before you originally and that you had a motion to dismiss and was reversed by the court. If you rule in my favor on that, the parties have to answer the third amendment complaint. Because it should never have been dismissed in the first place, which is why the defendants intervened into this action, because of that prayer for relief. They're all here. We're all here. So if the court rules in that regard, we need to have something from this court that says answer the complaint. Because otherwise there's going to be another motion to dismiss and another motion to dismiss. We're beyond that point right now if the court finds that the complaint states a call to action. And the alternative is I have filed a fourth amendment complaint and we potentially come back here again and again. But you already have filed a fourth amendment complaint. After this appeal, yes. I did pursuant to the court order. But Harrison's not a party to that complaint. Right. Yes. And it's not before this court. So it's not likely that you won't come back on those. I mean, I'm sure that there are motions pending on those as well. But if we want to come back, we should come back so we can actually answer the appellate court's questions substantively on what these issues are without just allegations. The issue on the 2615 is does it state a call? It's that simple. When we're sitting here arguing who did what, why did you do this, those are summary judgment arguments. What we need to do, and if they want to file motions for summary judgment, let them do so. I'm ready to go. We can do all that. We can do the discovery and get all that going. I'm confident in this case in that regard. But we have to be able to get to that point. We're seven years, and I can't even get them to answer, you know, how much money did you – how much money did the B&B make? If I can't get that, I can't answer your questions. Thank you. Thank you. All right. Counsel, thank you for your arguments in this matter. We will take the matter under advisement. I suggest it will not be as quick as Friday or next Monday, but we will do our best to get it out in due course.  Thank you.